May it please the Court, my name is Ryan Norwood, I'm an attorney with the Federal Defender in Nevada, and I represent Kevin Camp. I'd like to reserve about three minutes for rebuttal. This case hinged on medical evidence. Mr. Camp was prosecuted and then convicted based on testimony from purported experts that the fatal injuries to this child had to have happened shortly before his death and during a time that Camp was indisputably alone with the child. Evidence that's subsequently been presented to both the State courts and to the Federal courts shows that this was junk science, that in fact that there was no way for these experts to narrow down the time of death to this frame, and in fact that there was a lot of evidence that suggested these injuries happened before that time. Without this medical evidence, it is at least reasonably probable that Mr. Camp wouldn't have been convicted. In fact, there would have been every reason to look at the other suspect in this case, the child's mother, who had subjected this child to an abusive living environment since the day he was born and who had mysteriously left their apartment shortly before his death. I've outlined in the brief. Forgive me for interrupting and going to one specific issue, but it's something I was a little unclear about. Maybe you can help me out. If the discovery that you say should have been made with respect to the rebuttal expert, to make it reciprocal to the discovery that was made by the defense of their expert, had been made, what questions would have been put to the rebuttal expert that were not put? You're referring to Dr. Clark, the State's rebuttal expert who wasn't noticed prior to trial. Yes. Right. And part of what you're complaining about, if I understand it, is that this rebuttal expert is called without any notice. There's none of the discovery of an expert that was made by, for example, your expert prior to trial. No, and you don't get another day. You get one day, but no more to recall your expert and so forth. I'm just unclear as to what the prejudice was. What questions would have been put to the rebuttal expert, Dr. Clark, that were not put, based on the discovery that you say should have been given to you? Our primary contention with Dr. Clark is that she never should have been allowed to testify at all, because in allowing her to testify without any notice, the State violated the clearly established rules set forth in Wardius v. Oregon, which requires reciprocal discovery obligations. Nevada requires the defense to provide all this information about expert witnesses that they may call, in their case in chief, to rebut the State's theory. But as was interpreted here, they did not. So I understand that, in your view, she should not have been allowed to be called at all, the rebuttal expert, but she was. So that's a, hypothetically, let's assume that's an error. Then the question becomes whether it's a prejudicial error, right? So the, if the reason it was an error for her, for, is it her or her, I'm sorry, I don't remember, the rebuttal expert. But anyway, if the reason why it was error for the rebuttal expert to be allowed to testify was that it did not comply with the requirements of discovery, then the question would be, would it not, what questions would have been put to that witness on cross-examination based on the, if the discovery had been properly made? So that's why I'm asking that question. You know, at the, at the State court level, you know, the defense developed evidence both from Dr. Grist, who was the witness they had originally called, and from Dr. Oppoven, who was the witness that was noticed in those hearings, outlining specific areas of Dr. Clark's testimony that could have been rebutted. But our overarching contention here is that we shouldn't even get to that point, because once it was determined that the State had hid this witness from the defense, they shouldn't have been, you know, they shouldn't have been allowed to call her at all. And calling this witness prejudiced the defense. I mean, even, they had two, the State had these two other experts who testified in the case in chief. But what was interesting about both of them is that both of them had originally admitted that the timing of the injuries could have been much broader than what they later claimed at trial. So the question is, are you saying that even if adequate discovery had been made, they would have been forbidden, and notice had been given that they would have been forbidden to call the rebuttal expert, that there could never be a rebuttal expert in this kind of situation? No, I'm not saying that. If they had properly noticed her, she could have testified. So don't you, therefore, have to show prejudice from the fact there was prejudice in the trivial sense that the rebuttal expert obviously is going to give testimony different from what your expert had gave. But what you're really complaining about, are you not, is the failure to have notice and discovery. And so then the question is, if you had had notice and discovery, what different questions would you have put? Again, the problem here is we didn't have notice and discovery. What I'm saying is that if we're reconstructing what should have happened at this trial, having not disclosed this expert, once the rebuttal case came around and the State said, oh, we'd like to call this witness, the trial judge should have said, no, you can't call this witness, and that would have been the end of it. What I would like the Court to primarily focus on, and I agree it should look at the Wardius issue here, is are these allegations of ineffective assistance of counsel. Mr. Kemp's lawyers just weren't prepared to defend him at all against this medical evidence at trial. The lead lawyer in this case was a man named David Figler. Last September, within the span of about a week, this Court issued two different opinions concluding that Mr. Figler had not only ineffectively represented, but abandoned his client in the course of a State post-conviction proceeding. What we have here is more of the same in the trial context. Mr. Figler was the attorney of record for two years before this trial rolled around in April of 2000. And yet, when he comes in on the first day of trial, he represents to the Court that he's not ready and that, in fact, that he would be providing ineffective assistance under the Strickland standard if the trial went forward. When he testified after the trial, he described trying this case as – I think the words he used was he was trying the case with a blindfold on and that he was grasping at straws. The other lawyer in the case had just joined the public defender's office. She was assigned to the case just a few days before the trial started, and she later admitted that it was – would have been humanly impossible for her to prepare for this case effectively and that she had no business being on the case in the first place. And yet, she was delegated many of the crucial tasks in the trial, including the opening statement and the direct examination of the defendant. Both attorneys were asked throughout the State post-conviction proceeding about, you know, why they didn't do certain tasks at the trial, and their uniform answer every time the issue came up was, we didn't have a strategic justification for it. We just weren't ready. The State judge who heard all these lawyers testify credited their testimony and found that they provided deficient performance, and that performance prejudiced Camp in numerous different ways. And when the Nevada Supreme Court, even though they ultimately reversed that judgment, they specifically said in their order that there were no credibility issues that they had any issue with regarding the trial judge's findings. So what we have here is a case that's in a very different posture than the normal case that might come before this Court in the habeas context. Normally, when there are ineffective assistance of counsel claims raised, there are two State courts. The lawyers will say, no, we weren't ineffective, we had good reasons for not doing what we did. The State court will credit those representations, and then we're obliged to apply a heavy dose of deference to those findings. What we have here is the opposite. We have lawyers who acknowledge that they are ineffective, and we have a State court that found that they were, in fact, ineffective. If anything, that's what we're obliged to defer to here. There's still, of course, the question of prejudice. I've outlined in the brief a number of different ways that this completely ineffective preparation prejudice camp, starting with the fact that they did not call an effective expert at the trial to rebut the State's testimony. Dr. Janice Oppoven is a pediatric forensic pathologist who specializes in pediatrics. She was far more qualified to testify about what happened here than anyone who testified at the trial. Well, that's hard to make an IAC claim out of not finding the most effective expert. There was an expert witness who testified on behalf of the defense. The expert witness appeared to have been qualified to testify on the subject. She testified in a way that was favorable to your client, supported the basic theory, which is that the time between when the injury could have occurred and the How is that ineffective assistance of counsel, particularly given the fairly low bar that Strickland sets? The expert you're referring to, Dr. Grice, well, first of all, two things about her. The State repeatedly attacked her during cross-examination for not having specific expertise in dealing with children. That's exactly the issue that could have been, that Dr. Oppoven didn't have. Second, you know, when the State Had any of the witnesses who testified for the State during its case in chief had specific experience with children? No, they were even less qualified. They weren't specialists either. So at this point, I mean, because of Dr. Clark not being on the table, how do you fault defense counsel for coming up with someone who is at least as qualified and probably better qualified than the or I should say just at least as qualified as the witnesses that have been offered by the State during the case in chief? The lawyer isn't effective simply because he did the minimum, you know, because he called an expert. I mean, the question is whether this process of choosing and calling an expert was the result of deficient performance. In this case, we have the lawyer saying over and over again before, during, and after the trial that he wasn't ready to try the case. This was a lawyer who was noticed at the last minute. I've heard that, and I understand that. I'm focused now on the particular argument I thought you were making with regard to not properly identifying and presenting testimony from a qualified expert witness. And there was an expert witness who struck me as qualified, perhaps not the best expert or the most qualified, but deficient performance, that bar is a lot lower than simply — it's not enough to establish deficient performance by saying there was a better expert that could have testified. It is if that — the result of calling that less qualified expert was the result of ineffectiveness. I mean, there was a Supreme Court case — Right before the horse. I mean, we don't know that. We know that an expert testified, an expert who was qualified, who on the face of it was at least as qualified as the prosecutor's experts. What makes it ineffective assistance of counsel that the lawyer didn't discern that the prosecutor was going to whip out Dr. Clark later and didn't have somebody as qualified as Dr. Clark? Is there any case law that says that's ineffective, that's deficient performance? There's a case from the Supreme Court that is a summary reversal of just last year, you know, where a lawyer called an expert at the trial, and they still said that that was deficient performance because the process that led the lawyer to call that expert was ineffective and he could have called a better expert here. I mean, if there were — there's an overwhelming — the record here is overwhelming on the issue of deficient performance. This lawyer has admitted, and the State courts found, that he was completely unprepared to try this case. The State post-conviction lawyers, in the span of about a month, had no trouble locating Dr. Opphoven, who's a nationally renowned expert who specializes in forensic pathology regarding children. There's no reason why the attorneys couldn't have found a similar expert who could — who could have testified. What Dr. Opphoven said was — was much more useful to the defense than what Dr. Grice said. In fact, the State spent a lot of time with Dr. Grice emphasizing how similar her timeframes were to the State experts, because while she had a slightly larger timeframe, she was still in the ballpark of all these other experts and, you know, led the jury to believe that you could somehow tell with any degree of medical certainty that these injuries happened within a span of hours. What Dr. — what Dr. Opphoven could have explained was that — was that was simply wrong. That there's no way you could narrow these injuries down to even 12 hours of the child's death. And, in fact, that there's other evidence that shows that the injuries did not happen on the day of the child's death. The jury never heard this. What — what the State is primarily complaining about with regards to Dr. Opphoven is not so much the merits of what she says, but this issue under Cullen v. Pinholster, which is a misreading of what Pinholster says. We're not talking here about evidence that was — that wasn't before the State court. Everybody in State court knew about Dr. Opphoven. Her report was provided to the prosecutor, to the trial judge, and to the Nevada Supreme Court. Nor was there any contention that — that Mr. Kemp's lawyers were not following the State rules in presenting this report. What happened was that this was a sort of a piecemeal evidentiary hearing where there were — that was continued several times, and when there were bifurcated hearings over a span of a month. During the ongoing investigation, the defense, you know, discovered Dr. Opphoven and — and told the Court, we'd like to present her. The Court didn't preclude them from doing so. What it said was, let me look at the evidence you have, and if I decide there's not enough, then we'll deal with the issue of Dr. Opphoven. And the Court never had to reach the issue because it found that — that Kemp's lawyers had already presented plenty of evidence at the State court post-conviction hearing to justify relief. When the issue came up on appeal, Mr. Kemp said, you know, in his cross-appeal, well, if you're not going to grant relief, affirm the grant of relief, let's at least take another look at Dr. Opphoven's testimony. And what the Nevada Supreme Court said was, again, not that you failed to follow the rules with her, but that she wouldn't help you because, A, she was not a pediatric expert, and, B, it's not our role to re-examine the evidence presented at trial. Both of those findings were patently unreasonable. She wasn't a pediatric cardiologist, but she — but she was, as the lower court noted, a much more qualified expert than anyone else who testified at this trial. And re-examining the evidence presented at trial is exactly what we need to do in the prejudice inquiry of Strickland. Not only did they not call this expert, but they failed to adequately prepare the one — the expert that they did call, Dr. Greist. In particular, what the defense failed to do with Dr. Greist is — is to explore the importance of this time of death issue with the child. You have all these witnesses who are talking about, you know, the length of time between the injuries and the death, but to make sense of that, you need to know when the child died. The jury at the trial has led to believe that the relevant time of death was when the child was pronounced dead at the hospital, which was a little after 4 o'clock in the morning. But, in fact, there was plenty of evidence from the record that Greist could have explained had she been prepared to do so that showed that the death, you know, was substantially before them, perhaps by a matter of hours. The child's body temperature, the onset of rigor mortis, and the EKG strips, which were disclosed to the defense for the first time in the post-conviction hearings. Again, Mr. Camp's attorneys completely failed to explore this, and they acknowledged that they had no good reason for doing so. There are a number of other ways in which Mr. Camp is prejudiced that I went through in the briefing, you know, concerning a methamphetamine expert, concerning the failure to strike a juror who was an abuse victim. And, again, the lawyers were asked about this at the hearing, why didn't you do these things, and they said, we didn't have a good reason for doing them, we just weren't prepared. So unless there are any further questions about those issues, I would like to save the rest of my time for rebuttal. Roberts. And we'll hear from the State. Good morning or afternoon, Your Honors. My name is Jared Frost, and it is my pleasure to represent the State appellees in this matter. He walked to the store only 30 minutes ago. He must have slipped in the shower. Those words, or words to that effect, constitute the entirety of the explanation of visibly nervous Camp provided to emergency responders. When he was found with a severely battered and unresponsive 2-year-old child, covered with bruises, and suffering from extensive internal bleeding. Now, as you know, the parties have briefed numerous issues in this case. I'd be happy to address any of those issues that you may have questions about. But first, I want to take a few minutes to address the common issue of Camp's burden to show prejudice and emphasize the tremendous obstacles that he faced at trial and that he faces now in seeking habeas relief. In this case, there was overwhelming evidence that the child victim died by abuse. There was medical evidence showing that the the the So the issue, though, wasn't the defense built around the issue when that abuse occurred, whether it was therefore attributable to the mother or the father. And on that, the medical evidence was quite important, yes? Yes. And so the state calls without any notice whatsoever a rebuttal expert who directly on that point contradicts the defense expert, provides no discovery whatsoever. It's not like a fact witness. This is a medical expert. How can you possibly cross-examine a medical expert if you don't have some advance notice and the ability to see what their previous opinions were or what studies they've done or any of the other innumerable things that are the normal, you know, heart of examining an expert? Well, it certainly would have been difficult, Your Honor. I agree with that. However, the state was under no legal obligation to disclose this expert witness at the time. And there's no federally established law that would have required that. There's no constitutional violation with respect to that particular point in this case. And I think it's also important to note that there was very compelling evidence that CAMP was the responsible party for the child's death. Recall that there was this pattern of significant injuries suffered by the child in CAMP's care in the weeks leading up to the killing. There was also the mother's testimony. What evidence supports that proposition? Wasn't it mostly testimony from the mother? The mother testified and also the grandmother, Connie Lane, yes. So the mother and the mother's mother. Correct. Who have some motivation to point the finger at CAMP rather than at the mother. Certainly, Your Honor. Yes. Okay. Well, so there was evidence, but it's not exactly rock solid. I'll grant you that, Your Honor. It seems to come down to somebody horribly abused this child. Somebody was almost certainly either Petitioner or the child's mother. Well, to say that it must have been Petitioner because the child's mother said he abused the child, yeah, okay, but that's not all that compelling. Your Honor, there was significantly other — there was other significant evidence that pointed to CAMP's responsibility in this case. There was also the fact that the child was in CAMP's sole care for the four hours prior to when the responders arrived. There was, of course, the expert testimony from the three State experts who all placed the death or the — the fatal injuries to be within this four-hour period. Some of the testimony was even stronger than that. Dr. Green testified that the child would have been critical within 30 minutes of receiving these fatal injuries, which is consistent with the very severe injuries that this child suffered. And there's also the testimony from the State experts that the child could not have walked to the store after receiving the injuries as CAMP claimed to the emergency responders. There's also, and I think quite powerfully, this contrast between the emotional responses that the jury heard about between CAMP and Brooke Lane, the mother. When CAMP was encountered by the responders after they were called, he appeared visibly nervous. He did not ask about the welfare of the child. In fact, he asked to leave. On the other hand, when Brooke Lane was informed of the child's death, she — the testimony was that she crumpled to the ground. She was hysterical. She was weeping. Everything that you would expect that a mother would respond to, even a very imperfect mother like Brooke Lane here, would not have been. Even a mother who maybe had beaten the child herself some hours before. The Honor, I — I mean, it's supposedly conceivable, but the jury did not think so in this case clearly. Anyway, all this is to say that this — But the challenge is not to the jury's verdict. This isn't a challenge to sufficiency of the evidence. This is a challenge to the case that the jury heard. Dr. — and I can't pronounce her name — Hofvoldt, the witness who was not allowed to testify, that came — that wasn't denied testimony, who didn't arise until later. The witness that is being offered now is the kind of witness that defense should have offered at trial. She tells a somewhat different story. Well, I think it's important to look exactly what she does say. And I don't think this is set forth in the briefing very well, so I would like to address that. As was noted earlier, the defense did provide an expert, an expert who provided an opinion that was consistent with the basic theory that someone other than Kemp was responsible for that injury. However, even considering Dr. Opholden's first report, we've, of course, provided argument that this Court should not consider that. But even considering that evidence, Kemp can't — cannot — cannot establish prejudice here. I hear your point about the Court shouldn't consider, but you're making an argument that says this man's guilty. The evidence is overwhelming. And as to that, is it inappropriate for us to consider what evidence might have been submitted? I mean, you're pointing, for example, to the fact that they say he couldn't have walked to the store or that these injuries would have made him critical within 30 minutes. But, in fact, we know that there's medical evidence out there, and the State courts had available to it, if it elected to turn to it, evidence to the contrary. Don't we — don't we appropriately consider that evidence? You know, we — we do not concede that point, and for the reasons that are stated in our brief. But what I'd like to — to explain is that even — even considering that evidence, that was not substantially different from what was presented at trial. If you look at page 2498 of the record, this is the first report of Dr. Janus Opholden. What page was that again? 2498, Your Honor. Thank you. And it's the only report that is arguably may be considered under the pinholster rule, because that's the report that was presented, at least, to the State court at the — the post-conviction hearing. Now, on page 2501, the key language that the — Mr. Camp points to is about halfway down the page, and there's a — a sentence there that's not attached to anything, and it says, There are no findings in this case that would allow the timing of injury to be narrowed to within 12 hours of his death. And the way Camp reads this is that Dr. Opholden is — is referring to the fatal injuries. But that's not — that's not clear from the report, at least as I read it. First, it's not consistent, again, with the very — very severe injuries that this child suffered. It's also inconsistent with the other four experts who testified in this trial. It's also of note that that same language is repeated in the next full paragraph after Dr. Opholden discusses some of the older injuries that the child had suffered. At the bottom of that next full paragraph, I would have disagreed with any testimony that suggested the timing of injury could be limited to less than 12 hours. Again, so it appears to me that what she's talking about here are those older injuries. But in any event, none of this would have excluded Camp as the killer in this case. And for that reason, there's — there's — Mr. Camp can't show prejudice based on this evidence. Kennedy. Well, wait a minute. He doesn't have to prove to a fault that he's not guilty. All he has to do is establish reasonable doubt. Why wouldn't this arguably establish reasonable doubt? Well, Your Honor, the standard that we're looking at here in this case, in a Federal habeas case, is to determine whether the State court's determination that to deny relief, that Mr. Camp had not shown a reasonable probability of acquittal but for these alleged errors, whether that was reasonable. That's a number of steps removed from this idea of whether he could prove reasonable doubt. The courts have said that even if this Court disagrees, even if it thinks it's a clear error, that that's not enough. It has to be an error so well established that there could be no — no reasonable jurist that could come to a different conclusion. It's a very high standard, an extraordinary standard, that Mr. Camp has not met in this case. Your Honor, my colleague referred to another claim in which the claim is that the counsel is ineffective for failing to prepare Dr. Gries, the expert who did testify at trial, by providing her with EKG strips that they say were not sufficient  that they would have been able to push back the time of death. And the problem with this argument is that Dr. Gries testified at the post-conviction hearing that she cannot provide a specific opinion as to the time of death. And so any impact on the verdict would have been entirely speculative. Roberts, but if — this is a Brady claim, right, that the evidence had not been turned over in advance? So if competent counsel had known from his witness that she couldn't speak to that issue, wouldn't competent counsel be expected to find an expert who could? Your Honor, this is the ineffective assistance of counsel claim. There is a related Brady claim. And it fits. I mean, the argument as to the EKG strips, as I understood it, is that they were in the prosecutor's files but not turned over. If they had been turned over in advance, isn't it the case that a competent attorney, if told by his experts that she couldn't speak to that, would have sought to locate an expert who could speak to that? Perhaps, Your Honor. But, again, there's no evidence in this case that a better expert, a more qualified expert could have provided an opinion that would have excluded Campbell. Your argument is just that there's no prejudice because Mr. — Ms. — Dr. Gries, is it pronounced? And you argue this in your brief, too, that she wasn't in a position to speak to it. Is that correct? That's part of it, Your Honor, yes. Okay. Well, then, let's go to the second part. Isn't it a logical inference, then, that if you're a lawyer and your expert tells you I can't tell you what these mean, what effect these have, the next thing to do is to go find somebody who can tell you that? Perhaps, Your Honor, yes. But still, even if Mr. Camp was able to demonstrate deficient performance, he still has to establish the prejudice prong. If the EKG strips indicated time of death that's earlier, and all the experts have opined on how long before the time of death the injuries could have inflicted, isn't it logical if you move earlier the time of death, you're also moving earlier the potential time of injury? Yes. Isn't that the relevance? Well, it's relevant, Your Honor, but again, we don't have evidence in this case showing that if counsel had found Dr. Ophoven or anyone else, that that could have been established in a way that was a — would have resulted in a reasonable probability of acquittal. So further, all this Court has to do is determine whether it's, you know, that prejudice decision by the investigation. The Nevada Supreme Court apparently dealt with the EKG strip issue by saying that could have been raised on direct appeal. Is that correct? I'd have to double-check, Your Honor, but that's — If that is correct, then I'll check, too. How could that be if the EKG strip evidence wasn't revealed until later? It's a Brady violation. And so it could have been raised on direct appeal if it had been known about, but if the defense didn't know about it, they could hardly be faulted for not having raised it, could they? No, Your Honor. No? So if a prosecutor succeeds in keeping the Brady violation secret past the direct appeal, he's home free? No, of course not, Your Honor. Okay. Then tell me how it is that if, in fact, the Nevada Supreme Court set that argument aside by saying it should have been raised on direct appeal, and if defense didn't know about the EKG strips until after direct appeal because they hadn't been turned over by the prosecution, isn't there something missing there? Well, how can we sustain the Nevada Supreme Court decision is not unreasonable if it's based on a faulty premise? Well, Your Honor, this Court should look to the language that, of course, the Supreme Court used. What I'm trying to address here is that if counsel wasn't aware that the EKG strips existed, he certainly couldn't have been deficient in failing to make a discovery request for those specific things. And it's also important that, again, even if counsel is deficient in failing to make a discovery request, the performance prong still has to be established. This was a case of the separate Brady issue here. We don't have to look at everything through the lens of ineffective assistance of counsel. Correct. Brady also includes a prejudice prong. Materiality, correct. And under that analysis, once again, it's important to look at what evidence was presented against Camp. There was compelling evidence that Camp was the responsible party for the child's death in this case. There hasn't been any evidence to establish that the EKG strips or any other evidence in this case that that was the case. Roberts, we may be in a little bit of a catch-22 because, as you've properly argued under Penholster, the Federal courts limited to the evidence that was before the State. Was there ever an opportunity for that kind of evidence to be put before the State with regard to the EKG strips? I don't recall, Your Honor, when the EKG strips were disclosed at the post-conviction hearing, and that's where they became part of the State court record. I confess, I don't know the answer to that question either. That's why I thought you might ask you. There are lots of moving parts here. But if, in fact, they weren't known until later, what recourse would Camp have? Let's try that again. If they were known by the time of the State post-conviction proceedings, then presumably there would have been opportunities for Camp at that time to submit the prejudice evidence. If they weren't known until later, what happens? I don't know, Your Honor. I believe that in this case they were disclosed at the post-conviction hearing. They were disclosed when? The post-conviction hearing, the State post-conviction hearing, Your Honor. Your Honor, I just want to conclude in saying that it's now been more than 16 years since Lamar Brooks, Jr. was battered to death. And during this lengthy period, Mr. Camp has had multiple opportunities to challenge the validity of his conviction and has failed to establish any basis for relief. And for these reasons, the judgment of the district court should be affirmed and this case should come to a close. If there are no other questions, that concludes my presentation. Thank you. Roberts. Roberts. Following up on a point that came up in the State's argument, I mean, a lot of what the Nevada Supreme Court is doing in denying ineffective assistance claims in the post-conviction appeal is sort of bootstrapping off the earlier rulings on the directive appeal by saying that the lawyer wasn't at fault because, you know, because he didn't know about it because the State didn't disclose the evidence to him. For example, one of the grounds that he was grant – that Camp was granted relief on by the State district court was a ground that the State, you know, that the lawyer was responsible for not obtaining CPS records from the child. And the reason the Nevada Supreme Court reverses that is they say in their post-conviction order, no, that was the State's fault. In fact, they had found on direct appeal that the State had committed a Brady violation there. Well, if that's true, then what we have is a Brady violation instead of an ineffectiveness claim. But the bottom line is that there was still a constitutional violation and it's still prejudice, Mr. Camp. Something similar happens with the claims regarding the rebuttal expert, Dr. Clark. The lower – the State lower court found that the lawyer was ineffective for not preparing a rebuttal expert for Dr. Clark. What the Nevada Supreme Court says is, well, the defense lawyer wasn't ineffective because he didn't know about Dr. Clark before she testified. That, of course, is exactly the problem that that was raised on direct appeal, and the Nevada Supreme Court said that that was perfectly okay. Judge, but just to address the point we were discussing during my argument, my contention is that there is an enormous difference between Dr. Oppoven and Dr. Grist. I think your concern was going back to the deficient performance prong. I would agree that if the process that led Attorney Figler to call Dr. Grist instead of Dr. Oppoven was the result of an effective investigation, that there would be no claim there, that we wouldn't get to prejudice. But what the State court record overwhelmingly shows is that that's not what happened. This lawyer didn't do an effective investigation with respect to anything. What you have to show is the lawyer who did an effective preparation would have called something more than Dr. Grist, and that's what I don't see. Well, I think that's exactly what the record shows. I mean, we have we can compare what he did versus what the State post-conviction lawyers did. I mean, Mr. Figler had two years to find an expert. You can always do better, especially in retrospect, but you can always do better. The Supreme Court has been very clear that the ability to do better doesn't demonstrate the first person was deficient. I think anyone could have done better than what Mr. Figler did here. He did as much as the prosecutor did, at least during the State and Chief. His expert was at least as qualified as what the prosecutor offered. That's not what the State was saying at the time of the trial. There is an enormous difference between what he could have done with Dr. Oppoven and what he did do with his ineffective preparation with Dr. Grist. Let me point you to one specific thing which we've been talking about, the EKG strips. Suppose they were disclosed, and as I look more carefully at my notes, I think it's probably the case, that they were disclosed during the State post-conviction relief stage. What evidence is there in the record that the tardy disclosure was prejudicial? That is, that somebody could have made something out of the EKG strips? That comes directly from Dr. Grist. What she said is, you know, if I had the EKG strips and we knew about them, what I would have advised you to do is to seek out a pediatric cardiologist who could have testified, who could have explained the relevance and quite possibly move the time of death backwards. Is there any evidence that, in fact, there was, I mean, is that covered by Dr. Oppoven, the name I can't, the Dr. O's report? Dr. Oppoven, she, it looks like what happened is the post-conviction attorneys were originally looking for a pediatric cardiologist, but as the district court found, what they did was they found something even better. They found Dr. Oppoven, who was, I don't think she specifically dealt with the EKG strips, but what she explained was that the prior testimony offered by everyone, including Dr. Grist, was just unscientific and that there was no way to pin down this time of death. Thank you. We thank both counsel for your helpful arguments. The case just argued is submitted. That concludes this morning's calendar. We're adjourned.
judges: Rakoff, Noonan, Clifton